# United States Court of Appeals for the Federal Circuit

2008-1375

LINE ROTHMAN and GLAMOURMOM LLC,

Plaintiffs-Appellants,

v.

TARGET CORP.,
KOHL'S DEPARTMENT STORES, INC., J.C. PENNEY COMPANY, INC.,
REDCATS USA, L.P. (doing business as Lane Bryant Catalog),
ELIZABETH LANGE LLC (doing business as Liz Lange Maternity),
and LEADING LADY,

Defendants-Appellees,

and

MOTHERSWEAR INTERNATIONAL,

Defendant-Appellee,

and

FEDERATED DEPARTMENT STORES, MACY'S DEPARTMENT STORES, INC.,
K-MART CORP., and SEARS HOLDING CORPORATION,

Defendants.

John F. Sweeney, Morgan & Finnegan, LLP, of New York, New York, argued for plaintiffs-appellants.

R. Terrance Rader, Rader, Fishman & Grauer PLLC, of Bloomfield Hills, Michigan, argued for all defendants-appellees. With him on the brief were Charles W. Bradley, Kristin L. Murphy, and James F. Kamp.

Robert J. Schoenberg, Riker, Danzig, Scherer, Hyland & Perretti LLP, of Morristown, New Jersey, for defendant-appellee Motherwear International, Inc.

Appealed from: United States District Court for the District of New Jersey

Chief Judge Garrett E. Brown, Jr.

# United States Court of Appeals for the Federal Circuit

2008-1375

LINE ROTHMAN and GLAMOURMOM LLC,

Plaintiffs-Appellants,

v.

TARGET CORP.,
KOHL'S DEPARTMENT STORES, INC., J.C. PENNEY COMPANY, INC.,
REDCATS USA, L.P. (doing business as Lane Bryant Catalog),
ELIZABETH LANGE LLC (doing business as Liz Lange Maternity),
and LEADING LADY,

Defendants-Appellees,

and

MOTHERSWEAR INTERNATIONAL,

Defendant-Appellee,

and

FEDERATED DEPARTMENT STORES, MACY'S DEPARTMENT STORES, INC.,
K-MART CORP., and SEARS HOLDING CORPORATION,

Defendants.

Appeal from the United States District Court for the District of New Jersey in case no. 05-CV-4829, Chief Judge Garrett E. Brown, Jr.

_____

DECIDED: February 13, 2009

_____

Before RADER, FRIEDMAN, and BRYSON, <u>Circuit Judges</u>.

RADER, <u>Circuit Judge</u>.

By jury verdict, the United States District Court for the District of New Jersey found claims 1, 5, and 12 of U.S. Patent No. 6,855,029 ("the '029 patent") invalid. In addition, the jury declined to find infringement by appellee Motherwear International ("Motherwear"). The jury also found the '029 patent unenforceable due to inequitable conduct. The district court sustained the jury's verdict on all counts, denying Ms. Rothman's and Glamourmom LLC's ("Glamourmom's") motions for judgment as a matter of law ("JMOL") and awarded costs to Appellees. Rothman v. Target Corp., Civ. No. 05-4829, slip op. at *1-2 (D.N.J. May 6, 2008) ("Final Judgment Order"). Because the district court erred in upholding the jury's inequitable conduct finding, this court affirms-in-part and reverses-in-part.

I

The '029 patent claims a nursing garment "with invisible breast support for nursing mothers." '029 patent col.1 ll.52-55 (filed June 30, 2003). The specification teaches a garment with a smooth appearance and no outer cups that conceals a fully-supportive nursing bra. Id. at col.1 ll.61-62, col.2 ll.5-6. The preferred embodiment of Ms. Rothman's invention, depicted in Figures 2, 3, and 4, below, is a tank top or undershirt with a built-in nursing bra.



The critical components of the visible, external portion of the nursing garment are the "external nursing flaps" 3. These external nursing flaps extend upwards from the front section of the "stretch body wrap" 10A and "are attached to the internal nursing flaps 8A and to the shoulder straps 5 to give a smooth single garment appearance." Id. at col.3 ll.10-14.

The concealed nursing bra derives its structure from "the elastic chest band 15, the soft cup frame 2, the internal nursing flaps 8A, and the back piece of fabric 8B." Id. at col.3 ll.21-24. The only external aspects of the nursing bra are the shoulder straps 5, and, in some embodiments, the fasteners 1 and 4. Id. at col.3 ll.8-10, 28-29.

As shown in Figure 2, the wearer separates fasteners 1 and 4 and folds down the internal and external nursing flaps 8A and 3 to access the breast for nursing. Id. at col.3 ll.39-44. After nursing, the wearer simply reattaches the flaps. Id.

Claim 1 is representative of the three independent claims at issue in this appeal:

1. A nursing garment comprising:

a shoulder strap having a front end and a back end;

an elastic chest band having a front section and a back section;

a soft cup frame having a base and a top, said soft cup frame attached at said base thereof to said front section of said elastic chest band and attached at the top thereof to said front end of said shoulder strap;

a back piece having a base edge thereof attached to said back section of said elastic band and a top edge thereof attached to said back end of said shoulder strap;

an internal nursing flap having a base and a top, said base thereof attached to said base of said soft cup frame;

> a first fastener attached to said top of said internal nursing flap, and a second fastener attached to the front end of said shoulder strap, said first fastener adapted to fasten said top of said internal nursing flap to said second fastener; and,
>
> an elastic stretch fabric body having a top front edge attached to said top of said internal nursing flap and a rear top edge attached to said back end of said shoulder strap.

Id. at col.3 ll.45-67.

A fledgling inventor, Ms. Rothman developed her garment to fill a perceived gap in market offerings. After the birth of her first child in March 2000, Ms. Rothman sought out a nursing garment that would conceal her stomach while providing easy nursing access and full breast support. Unable to locate anything more elaborate than "just basically nursing bras," Ms. Rothman undertook the task of designing her own garment.

Ms. Rothman's inventive process lasted "a couple of days [to] a couple of weeks." Then, one day, with her design in mind and her husband watching their child, she set to work in the family kitchen and stitched together her prototype. As starting materials, Ms. Rothman used an off-the-shelf Jockey tank top with a built-in shelf bra and an off-the-shelf Olga nursing bra. She combined these products, additional fabric, fasteners, and other sewing materials to arrive at her prototype. Applying the language of the '029 patent claims to her prototype, Ms. Rothman acknowledges that the Jockey tank top contributed the "back piece," "internal nursing flap," and "elastic stretch fabric body" set forth in claim 1. Ms. Rothman relied on the Olga nursing bra to serve as the "soft cup frame."

On July 12, 2000, several weeks after completing her invention, Ms. Rothman mailed herself a letter describing her invention. The letter explains that the "Topless

Topnotch Nursing Top" "has a built in bra that opens up with a snap to release the cup for nursing." The letter then describes the purpose and function of the garment:

> The name Topless is because you need to wear only one top whereas before with the same cover you needed to wear a nursing bra and a top over it that could stretch under the breast to open the bra. So it makes the woman feel free and topless.

Eager to secure protection for her garment, Ms. Rothman contacted patent attorney Allan Jacobson to file a patent application. Mr. Jacobson filed a provisional patent application for Ms. Rothman's garment on October 6, 2000, and a PCT application on October 3, 2001. During this time, Ms. Rothman and her husband, Michael Rothman, formed Glamourmom to produce, market, and sell her design. The '029 patent issued on February 15, 2005.

On October 7, 2005, Glamourmom filed this lawsuit alleging infringement of the '029 patent by Appellees' products. Appellees denied these infringement allegations and countered that claims 1, 5, and 12 -- the independent claims of the '029 patent -- were invalid due to anticipation and obviousness. Appellees also alleged prior inventorship by Leading Lady employee Haidee Johnstone and inequitable conduct during prosecution of the '029 patent.

On January 22, 2007, the district court held a <u>Markman</u> hearing to construe the claims of the '029 patent. The district court entered its <u>Markman</u> Order on March 5, 2007. A ten-day jury trial ensued with closing statements made on November 2, 2007. The jury returned its verdict on November 5, 2007. In that verdict, the jury concluded that each of Appellees' accused products—with the exception of those made by Motherwear—infringed the '029 patent. The jury also found the '029 patent invalid. In particular, the jury determined that U.S. Patent No. 4,648,404 to Clark, U.S. Patent No.

6,282,719 to Vera, and Leading Lady garment styles 460 and 438 anticipated the '029 patent. The jury further found the '029 patent obvious in light of the prior art. Appellees also prevailed on their inventorship and inequitable conduct defenses.

After trial, Glamourmom renewed its motions for JMOL that the '029 patent is not anticipated or obvious, and that it is indeed infringed by the Motherwear products. Glamourmom also renewed its motions for JMOL that Ms. Johnstone did not make the invention of the '029 patent before Ms. Rothman, and that no inequitable conduct occurred during prosecution of the '029 patent. The district court denied each of these motions and awarded costs to Appellees. Glamourmom now appeals the denial of each of its five motions for JMOL. This court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

II

This court reviews the District of New Jersey's denial of a motion for JMOL by applying the standard enunciated by the United States Court of Appeals for the Third Circuit. Agrizap, Inc. v. Woodstream Corp., 520 F.3d 1337, 1341 (Fed. Cir. 2008). Under Third Circuit law, this court exercises "plenary review over a district court's rulings on motions for JMOL, applying the same standard as the district court." Id. Accordingly, this court may only grant a motion for JMOL where the non-moving party has benefited from a full hearing on the issue during a jury trial, and where a reasonable jury would not have a legally sufficient evidentiary basis to find for the non-moving party on that issue. See Fed. R. Civ. P. 50(a). This court "may not weigh the evidence, determine the credibility of witnesses, or substitute [its] version of the facts for the jury's version." Agrizap, 520 F.3d at 1342.

In this case, Glamourmom's unsuccessful challenge to the obviousness verdict renders superfluous its additional validity and infringement arguments. Accordingly, this court limits its discussion to that primary validity issue.

In considering the district court's denial of Glamourmom's motion for JMOL of nonobviousness, "'[t]his court reviews [the] jury's conclusions on obviousness, a question of law, without deference, and the underlying findings of fact, whether explicit or implicit within the verdict, for substantial evidence.'" Dippin' Dots, Inc. v. Mosey, 476 F.3d 1337, 1343 (Fed. Cir. 2007) (quoting LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc., 275 F.3d 1347, 1353 (Fed. Cir. 2001)). "Those factual underpinnings include the scope and content of the prior art, differences between the prior art and the claims at issue, and the level of ordinary skill in the art." Id. at 1343. In undertaking this review, the factual inferences and credibility determinations predicate to the jury's obviousness determination are drawn in favor of the verdict winner. See C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1351-52 (Fed. Cir. 1998). The essential question is "whether the jury's verdict is sustainable on the evidence presented, not whether [this court] could have or would have gone the other way on the evidence presented." PharmaStem Therapeutics, Inc. v. ViaCell, Inc., 491 F.3d 1342, 1375 (Fed. Cir. 2007).

A

Despite this court's deferential role in reviewing factual findings made by a jury, Glamourmom offers a highlight reel of testimonial sound bites from Appellees' witnesses in an effort to make the jury's verdict seem unreasonable. The centerpiece of Glamourmom's substantial evidence argument is an excerpt from the testimony of Appellees' technical expert, Walter Burzynski. During cross-examination, Mr. Burzynski

stated that Ms. Rothman's invention was "not imaginable" to him at the time of invention. Glamourmom contends that this "admission" pulled the rug out from under Appellees' obviousness argument because it is tantamount to a concession that a garment like Ms. Rothman's was not conceivable, much less obvious, to one of skill in the art at the time of invention. Review of this court's law and examination of Mr. Burzynski's testimony undercuts that proffered conclusion.

The only "admission" Mr. Burzynski made in his testimony was that he personally did not think of the idea embodied in the '029 patent before Ms. Rothman. Taken in context, Mr. Burzynski's testimony reveals merely that he did not conceive of a nursing tank top in the timeframe of Ms. Rothman's invention, not that the invention would have been unimaginable to a person of ordinary skill in the field:

> Q: Okay. Mr. Burzynski, did you ever suggest a crossover garment which was a sexy tank top sportswear garment with an inner nursing feature?
>
> A: No.
>
> Q: Okay. That idea didn't occur to you, correct?
>
> A: No, it didn't.
>
> Q: Okay. And you didn't appreciate any consumer need for such a product?
>
> A: No, not really.
>
> Q: In fact, that type of crossover product was not imaginable to you in your work, correct?
>
> A: Correct.

A reasonable jury could, as this jury apparently did, fairly dismiss this testimony as little more than a concession that Mr. Burzynski did not beat Ms. Rothman to the inventive

punch, rather than an admission that the invention would not have been obvious to an ordinary artisan. Indeed, had the jury reached the conclusion Glamourmom advocates, that conclusion would constitute reversible error.

In Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1364 (Fed. Cir. 2001), this court overturned a district court's dismissal of an obviousness defense in a preliminary injunction hearing precisely because it relied on an identical extrapolation. The district court in Amazon.com relied on an "admission" by Barnesandnoble.com's expert, Dr. Lockwood that he personally had not thought of the claimed invention as grounds for finding that Barnesandnoble.com's validity challenge "lacked sufficient merit to avoid awarding extraordinary preliminary injunctive relief to Amazon." Id. at 1347. As the district court put it:

> The Court finds particularly telling Dr. Lockwood's admission that it never occurred to him to modify his Web Basket program to enable single-action ordering, despite his testimony that such a modification would be easy to implement. This admission serves to negate Dr. Lockwood's conclusory statements that prior art references teach to one of ordinary skill in the art the invention of the '411 patent.

Amazon.com, Inc. v. Barnesandnoble.com, Inc., 73 F. Supp. 2d 1228, 1235-36 (W.D. Wash. 1999).

This court reversed, finding that the district court erred as a matter of law, and noting the proper standard for evaluating obviousness:

> Whatever Dr. Lockwood did or did not personally realize at the time based on his actual knowledge is irrelevant. The relevant inquiry is what a hypothetical ordinarily skilled artisan would have gleaned from the cited references at the time that the patent application leading to the '411 patent was filed.

Amazon.com, 239 F.3d at 1364. This reasoning applies with equal force in the instant case. Mr. Burzynski's testimony regarding his own inventive feats has little relevance to

whether Ms. Rothman's invention would have been obvious to a hypothetical person of ordinary skill in the field with attributed knowledge of the relevant prior art.

Glamourmom also refers to the testimony of Joseph Kirsch and Mark Corrado about nursing tank top designs in an attempt to negate the jury's obviousness verdict. Like the excerpt from the Burzynski testimony, these references are insufficient to negate the jury's verdict. Neither Mr. Kirsch, a Vice President at Dan Howard, nor Mr. Corrado, President of Leading Lady, testified as an expert witness or an ordinarily skilled nursing garment designer. Rather, they each testified to their personal reactions—in their role as industry executives—to an accused infringing article made by Ms. Johnstone. In particular, in the 2000 timeframe, Mr. Kirsch dismissed Ms. Johnstone's garment as "strange-looking" and "unusual," while Mr. Corrado regarded it as "an innovative new design."

Glamourmom has not and does not now assert that Messieurs Kirsch and Corrado qualify as industry experts, or even as ordinary nursing garment artisans. Nevertheless, Glamourmom argues that as nursing and maternity industry "veterans," Mr. Kirsch and Mr. Corrado could offer important testimony to show nonobviousness. While their testimony may have some bearing on the state of the prior art and various objective criteria for nonobviousness, Mr. Kirsch and Mr. Corrado do not offer anything that motivates this court to substantially question the jury's verdict. Even if Messieurs Kirsch and Corrado were qualified as nursing garment industry experts, their testimony, amounting to personal opinions about the design of an accused infringing garment, falls into the same category as the testimony in Amazon.com. Id. Moreover, assuming Messieurs Kirsch and Corrado were in fact ordinarily skilled nursing garment designers,

the jury would have been free to credit (or discredit) their testimony, and weigh it accordingly. In this case, however, the unelaborated statements of Messieurs Kirsch and Corrado about the novelty and oddity of an accused infringing product's design do not deprive the jury of substantial evidence on which to base its verdict.

B

In addition to offering these snippets of testimony, Glamourmom also contends that Appellees did not supply the jury with substantial evidence to support the conclusion that one of ordinary skill in the nursing garment industry would have been motivated to combine a tank top and nursing bra at the time of Ms. Rothman's invention.

To the contrary, this invention falls into a very predictable field. In the predictable arts, a trial record may more readily show a motivation to combine known elements to yield a predictable result, thus rendering a claimed invention obvious. KSR Int'l Co. v. Teleflex Inc., 127 S. Ct. 1727, 1731, 1740-41 (2007) (listing "the effects of demands known to the design community or present in the marketplace" and "the background knowledge possessed by a person having ordinary skill in the art" as variables central to any obviousness analysis).

Nursing garment design is a predictable art. As Ms. Rothman acknowledged in her testimony, "[a] shoulder strap is a shoulder strap." Thus, it is hardly surprising that Ms. Rothman, in just one "day into the night" of sewing, combined an off-the-shelf Jockey tank top with a built-in shelf bra and an off-the-shelf Olga nursing bra to arrive at the claimed invention. Indeed, Ms. Rothman's testimony confirms that the materials she combined performed as expected, with the Jockey tank top contributing the "back piece," "internal nursing flap," and "elastic stretch fabric body" set forth in her claims,

and the Olga nursing bra serving as the "soft cup frame." Of course, the "manner in which the invention was made" does not "negative[]," or negate, the invention's patentability. 35 U.S.C. § 103(a). In this case, however, the inventive process shows the predictability and expectations in this field of art.

Viewing the claimed invention in its prior art setting, this court observes that Mr. Burzynski offered evidence suggesting that the prior art would motivate one of ordinary skill in the nursing garment industry to combine a tank top with a nursing bra to obtain a nursing tank top. As he explained, "[a]ny one with any training in the field could have picked up two garments manufactured in any store, and put them together." Mr. Burzynski further testified that "all the elements that form the claims at issue here are in the prior art," and that in combination "all the elements still continued to operate just as they had previously." Indeed, he proceeded element-by-element through the features of the claimed invention, concluding that each element functioned in an ordinary and expected way in the '029 patent. Mr. Burzynski went on to show that Ms. Rothman's garment was obvious "[b]ecause it was common practice to use this kind of construction or combination [in 2000]. In the industry overall, not just by me." This testimony, combined with Mr. Burzynski's analysis of prior art garments (presented in connection with Appellees' anticipation arguments), provides ample support for the jury's conclusion that the '029 patent would have been obvious at the time of invention.

Moreover, the record is replete with evidence that one of ordinary skill would have been motivated and able to combine an existing tank top with an existing nursing bra to arrive at the claimed invention. For example, Ms. Johnstone, offered by Appellees as a person of ordinary skill, testified that she arrived at the design for the

Leading Lady 460 garment—which the jury found to anticipate the '029 patent—by combining her preexisting tank top and shelf bra design with her preexisting nursing bra design. **[A5044-45]** ("[A]nd then I made my nursing bra tank, Style Number 460, from the combination of these two bras [Ms. Johnstone's D338 and 438 designs] and my original idea of combining it with a tank."). Describing the simplicity of her purportedly infringing invention, Ms. Johnstone stated,

> The first time I designed, I have never changed it, and it has remained unchanged since the initial concept. It's just too easy. It was a tank with a shelf bra and a sling. I had the sling—I had the shelf bra. I just put a tank on it. That was it. There was no reason for it to be any different.

Ms. Johnstone also explained the motivation for one of ordinary skill in the nursing garment industry to combine a tank top with a nursing bra. She explained that by the summer of 1997, tank tops with built in shelf bras were ubiquitous in the women's clothing industry. She added that, during the late 1990s, pregnant and nursing mothers had transitioned from relatively sedentary lifestyles and a preference for loose-fitting clothing to a more active and visible existence. "[T]he transition was that they [pregnant women] were now exercising, exercising when they were nursing, and they were less likely to not want to show off that they were exercising." Thus, the market demanded apparel like the claimed invention. Finally, Ms. Johnstone explained that part of her job, as an ordinary nursing garment artisan "is to look at trends and try to have available to my customers the same things that are on the market or as close as possible with the adaptations I have to make for nursing." This evidence of a motivation to combine a tank top with a nursing bra, together with expert testimony that each of the elements of the claimed invention was known in the prior art and functioned as expected in the

claimed invention, supplies substantial evidence to sustain the jury's obviousness verdict.  See KSR, 127 S. Ct. at 1731, 1740-41.

Glamourmom attempts to overcome this evidentiary cornucopia by cherry-picking individual prior art references and arguing that their combination into a viable nursing tank top would require "numerous creative leaps."  This strategy does not rebut the jury's findings.  For example, Glamourmom contends that the "closest possible combination of elements" to the '029 patent would use the body of U.S. Patent No.



Clark patent, Fig. 1          Vera patent, Fig. 2

4,648,404 to Clark ("Clark patent") and the shoulder straps of U.S. Patent No. 6,282,719 to Vera ("Vera patent").  But according to Glamourmom, even that combination would not render the '029 patent obvious, because the Clark patent claims a "nursing slip," rather than an "outerwear nursing garment."

The first and most obvious difficulty with Glamourmom's position is that the '029 patent does not claim an "outerwear nursing garment," but simply refers to a "nursing garment" in the preamble of the independent claims.  Even hypothetically granting some merit to Glamourmom's analysis of a Clark-patent-Vera-patent combination, one particular improbable combination of prior art references does not show that the entire

body of prior art does not render the '029 patent obvious. Appellees proffered numerous prior art references during trial—four of which the jury credited as sufficient to anticipate the '029 patent. The jury fairly could have relied on any combination of these references in reaching its obviousness verdict. Moreover, the jury rightfully could have relied on testimony from Mr. Burzynski and Ms. Johnstone that an ordinarily skilled nursing garment designer would have been able and motivated to combine an existing nursing bra with an existing tank top to arrive at the claimed invention. See KSR, 127 S. Ct. at 1741 ("[T]he analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ.").

Equally unavailing is Glamourmom's contention that the Clark patent teaches away from the claimed invention because it teaches a separable nursing bra and slip. Despite Glamourmom's conjecture, the verdict gives no indication that the jury predicated its obviousness ruling on the teachings in Clark. Furthermore, Appellees presented sufficient evidence to permit the jury to conclude that an ordinarily skilled nursing garment designer would have recognized the possibility and desirability of modifying the Clark design into a unified garment.

C

In a final attempt to avoid invalidation of the '029 patent, Glamourmom turns to secondary indicia of nonobviousness as support for its motion for JMOL. In particular, Glamourmom proffers industry willingness to license Ms. Rothman's invention, commercial success, customer and industry praise for the claimed invention, and copying by Appellees as objective evidence of nonobviousness. This court, of course,

"has repeatedly explained, [that secondary consideration evidence] is not just a cumulative or confirmatory part of the obviousness calculus but constitutes independent evidence of nonobviousness." Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc. 520 F.3d 1358, 1365 (Fed. Cir. 2008). Nonetheless, this factual component of the obviousness calculus is uniquely within the province of the jury.

Indeed, Glamourmom does not explicitly accuse the jury of disregarding its evidence of secondary considerations. Rather, Glamourmom suggests that "[t]he jury's and district judge's findings of obviousness are [] highly contrary to the record evidence and lack any reasonable support." To the contrary, this court must presume that the jury adequately weighed this factual evidence and found it insufficient to support a finding of validity.

Indeed, a strong prima facie obviousness showing may stand even in the face of considerable evidence of secondary considerations. See Leapfrog Enters., Inc. v. Fisher-Price, Inc., 485 F.3d 1157, 1162 (Fed. Cir. 2007) ("The district court explicitly stated in its [bench trial] opinion that Leapfrog had provided substantial evidence of commercial success, praise, and long-felt need, but that, given the strength of the prima facie obviousness showing, the evidence on secondary considerations was inadequate to overcome a final conclusion that claim 25 would have been obvious. We have no basis to disagree with the district court's conclusion."); Motorola, Inc. v. Interdigital Tech. Corp., 121 F.3d 1461, 1472 (Fed. Cir. 1997) ("In reaching an obviousness determination, a trial court may conclude that a patent claim is obvious, even in the light of strong objective evidence tending to show non-obviousness.").

In this case, the district court unambiguously communicated the importance of secondary considerations to the jury. The lower court commanded that the jury "must consider" objective indicia of nonobviousness, such as commercial success, long felt need, copying, industry praise, and licensing activity in its instructions. The district court further cautioned that "[i]t is inappropriate to disregard any evidence relating to the issue of obviousness. While some parts of the evidence may weigh more heavily than others, your decision of obviousness should be held in abeyance until all of the evidence has been introduced." Because the district court duly instructed the jury to consider and weigh evidence of secondary considerations, this court sees no reason to disturb the jury's determination that this important factual evidence did not outweigh its assessment of obviousness in light of the prior art. See Motorola, 121 F.3d at 1472 ("However, the district court properly instructed the jury on these matters. Apparently, the jury rejected ITC's arguments and evidence on the secondary indications of non-obviousness. In reaching an obviousness determination, a trial court may conclude that a patent claim is obvious, even in the light of strong objective evidence tending to show non-obviousness. The district court did not err by its refusal to second-guess the jury on this conclusion." (citations omitted)).

III

Although this court's affirmance of the district court's rejection of Glamourmom's challenge to the jury's obviousness verdict vitiates the need to address Glamourmom's remaining validity and infringement arguments, Glamourmom's appeal from the jury's inequitable conduct verdict remains viable.

2008-1375                                          17

Inequitable conduct is an equitable defense to patent infringement most appropriately reserved for the court. See Baxter Healthcare Corp. v. Spectramed, Inc., 49 F.3d 1575, 1584 (Fed. Cir. 1995) (noting that "inequitable conduct is a matter for the trial judge, and not the jury"). Nevertheless, district courts occasionally delegate aspects of the inequitable conduct inquiry to juries. See Herbert v. Lisle Corp., 99 F.3d 1109, 1114 (Fed. Cir. 1996). In this case, the parties agreed to submit the pertinent factual inquiries as well as the ultimate question of inequitable conduct to the jury. Although not the preferred course, "[a]bsent a clear showing of prejudice, or failure to achieve a fair trial, the district court's choice of procedure will not be disturbed." Id.

To prevail on an inequitable conduct charge, a defendant must present "evidence that the applicant (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO]." Cargill, Inc. v. Canbra Foods, Ltd., 476 F.3d 1359, 1363 (Fed. Cir. 2007). Both of these factual elements require proof by clear and convincing evidence. Id.

The materiality of a prior art product turns on whether "a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." Symantec Corp. v. Computer Assocs. Int'l, Inc., 522 F.3d 1279, 1297 (Fed. Cir. 2008) (quotation omitted). In 1992, 37 C.F.R. § 1.56 was revised to more clearly articulate the materiality standard. Revised Rule 56 provides:

> [I]nformation is material to patentability when it is not cumulative of information already of record or being made of record in the application, and (1) it establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or (2) [i]t refutes, or is inconsistent with, a position the applicant takes in: (i) [o]pposing an

argument of unpatentability relied on by the Office, or (ii) [a]sserting an argument of patentability.

37 C.F.R. § 1.56(b) (2008).

Intent to deceive, like intent evidence generally, often relies on evidence from surrounding circumstances, but that showing must at all times reach a threshold of "clear and convincing." Baxter Int'l, Inc. v. McGaw, Inc., 149 F.3d 1321, 1329 (Fed. Cir. 1998). Indeed this particular intent showing requires intent to deceive, not a mere showing that "that information was not disclosed; [rather] there must be a factual basis for a finding of deceptive intent." Herbert, 99 F.3d at 1116. "[T]he involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." Kingsdown Med. Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 876 (Fed. Cir. 1988) (en banc). Gross negligence, for instance, is not sufficient to show deceptive intent. Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd., 533 F.3d 1353, 1359-60 (Fed. Cir. 2008).

If a defendant succeeds in proving materiality and intent to deceive, the court (or in this case the jury) must weigh these findings in light of all of the circumstances and determine if there was inequitable conduct. See Purdue Pharma L.P. v. Boehringer Ingelheim GmbH, 237 F.3d 1359, 1366 (Fed. Cir. 2001). "This requires a careful balancing: when the misrepresentation or withheld information is highly material, a lesser quantum of proof is needed to establish the requisite intent. In contrast, the less material the information, the greater the proof must be." Purdue Pharma L.P. v. Endo Pharms. Inc., 438 F.3d 1123, 1128-29 (Fed. Cir. 2006) (citations omitted).

Because the parties here agreed to submit the entirety of the inequitable conduct query to the jury, the applicable standard of review differs from the usual case. With

respect to the factual inquiries relating to materiality and intent, this court "ascertain[s] whether the presumed factual findings of material withholding and deceptive intent were supported by substantial evidence at the trial." Herbert, 99 F.3d at 1115. In evaluating the jury's ultimate conclusion that inequitable conduct occurred, this court must "determine whether there was substantial evidence whereby a reasonable jury could have reached the verdict that was reached, on the entirety of the record and in light of correct instructions on the applicable law." Id.

A

Appellees' inequitable conduct allegations rely in large part on the business relationship between Glamourmom and Leading Lady. Glamourmom first reached out to Leading Lady regarding Ms. Rothman's nursing tank top in June 2002. Her curiosity apparently piqued, Leading Lady Senior Vice President Robin Polack requested that her colleagues examine Glamourmom's website and review Ms. Rothman's nursing tank top. Glamourmom sent a sample of Ms. Rothman's design to Leading Lady in July 2002, and a copy of Ms. Rothman's published PCT application in August 2002. Some seven months later, in March 2003, Glamourmom and Leading Lady entered into licensing negotiations.

Before negotiating with Glamourmom, Leading Lady cut a deal with appellee Target to supply nursing tank tops. Although Glamourmom did not participate in the Target negotiations, documentary evidence suggests that the Target deal related to Ms. Rothman's design. For example, on April 23, 2003, Leading Lady sent Glamourmom a sample of the Target approved nursing tank. Just five days later, on April 28, Leading Lady lawyer Stanley Dub sent Glamourmom an email discussing the prospect of selling

the nursing tank top at Target under the Glamourmom name, and the conditions of a minimum annual royalty agreement between Glamourmom and Leading Lady. With respect to a minimum royalty, Mr. Dub noted that Leading Lady felt "pretty assured of strong initial business with Target, but [it has] no guarantees beyond the first order," suggesting that the Target agreement did in fact relate to the Glamourmom design. Nevertheless, Appellees argued at trial, as they argue now on appeal, that the Target agreement was for sales of a Leading Lady original design—Leading Lady style 460. Leading Lady did not disclose this competing nursing tank top design to Glamourmom at any time before or during their licensing negotiations.

Negotiations between Glamourmom and Leading Lady broke down in July 2003, when Leading Lady began to question the viability of Glamourmom's patent application. On July 14, 2003, Glamourmom attorney Mr. Jacobson sent Leading Lady a copy of the PCT examiner's preliminary rejection of Ms. Rothman's application. The very next day, Leading Lady forwarded an undated and undocumented sample garment identified simply as "JC Penney sport nursing bra" (Leading Lady style 438) to Mr. Jacobson. Mr. Jacobson examined the garment (though he never placed it on a mannequin), and determined that it in fact was a sports bra, rather than a torso-covering garment like Ms. Rothman's design.

On July 28, 2003, Mr. Dub sent Mr. Jacobson a letter formally cutting off licensing negotiations between Leading Lady and Glamourmom. In that letter, Mr. Dub also informed Mr. Jacobson that Leading Lady intended to go to market with its own nursing tank top design. Mr. Dub explained the chronology of Leading Lady's product development as follows: "Sometime around the beginning of 2003, Leading Lady

became aware of the [Glamourmom] 'tank top with nursing bra' product . . . Leading Lady subsequently produced its own prototype of a different tank top with nursing bra product" (Leading Lady style 460), which had since been ordered by its customers. Mr. Dub also asserted in that letter that Leading Lady had previously presented Glamourmom with prior art, Leading Lady style 438, and that Leading Lady style 460 currently on offer was "essentially the same product," "with only slight modifications." Mr. Dub concluded his letter by stating that Leading Lady did not believe Glamourmom was entitled to a patent, but that it would still consider an "option license" to the pending patent, albeit at terms much less favorable to Glamourmom than previously discussed.

On July 30, 2003, Mr. Jacobson sent the Leading Lady style 438 sports bra back to Mr. Corrado. In the accompanying note, Mr. Jacobson referred to the garment as a "prior sports bra product," and disputed its relevance to Ms. Rothman's patent application. Mr. Jacobson wrote, "As you are aware, there are two sides to every story. If you would like to discuss the relationship of this prior product to the new tank top product, and hear the reasoning behind the arguments for patentability, I remain available for consultation."

Mr. Dub again wrote to Mr. Jacobson on August 4, 2003. In that letter, he purported to correct a "misstatement" in the July 28 letter. In particular, Mr. Dub asserted that Target initiated discussions with Leading Lady in August 2002, and that those discussions concerned Leading Lady's own design, conceived of by Leading Lady's Director of Design without any prior knowledge of the Glamourmom product.

Mr. Jacobson responded to this letter three days later, on August 7, 2003. In his response, Mr. Jacobson identified numerous perceived inaccuracies in Leading Lady's

version of events. For example, Mr. Jacobson asserted that Leading Lady received a sample of Glamourmom's nursing tank on July 3, 2002, and that Mr. Rothman spoke with Ms. Polack, who expressed interest in the product on July 30, 2002, leading to the conclusion that Leading Lady knew of Glamourmom's design even before the amended August 2002 meeting date with Target. In Mr. Jacobson's view, this chronology suggests that "[i]t is likely that the product sample shown to Target in August 2002 was the Glamourmom Nursing Bra Tank sample that was delivered to Robin Polack at Leading Lady July 3, 2002."

Mr. Jacobson also explained in his letter that the "Leading Lady prior art product [style 438] is a standard nursing bra, adapted for sporting activities. It has no tank top body. The tank top product Leading Lady is proposing to sell to Target [style 460] is so substantially different from the prior art sports bra, the argument appears to be advanced in bad faith." Also on August 7, Mr. Jacobson filed a "Petition to Make Special" with the PTO to expedite review of Ms. Rothman's patent application. Mr. Jacobson included the letters from Leading Lady with the petition. However, Mr. Jacobson did not report Leading Lady styles 438 or 460 to the PTO as prior art or conduct any further investigation into the legitimacy of those garments.

On December 3, Mr. Dub informed Mr. Jacobson that Leading Lady filed a provisional patent application on style 460. That application cited the '029 patent as prior art—even though style 460 purportedly came into being years before Ms. Rothman's invention. Leading Lady filed its non-provisional application on September 24, 2004. However, Leading Lady expressly abandoned that application on January 19, 2007, during the pendency of this case—despite receiving a notice of allowance.

Leading Lady contends that it abandoned its application because it recognized that the patent would have been invalid under the public sales provision of § 102.

At trial Appellees argued that Glamourmom's failure to submit Leading Lady styles 438 and 460 to the PTO constituted inequitable conduct. Appellees also alleged that Mr. Jacobson engaged in inequitable conduct when he made unsubstantiated statements about how one of ordinary skill in the nursing bra field would interpret certain prior art references.

Because the jury returned a general verdict that simply found that Glamourmom committed inequitable conduct, this court must assume that the jury found in Appellees' favor on each count. See Newell COs. v. Kenney Mfg. Co., 864 F.2d 757, 765 (Fed. Cir. 1988) ("Judges must accept the factual findings, presumed from a favorable jury verdict, which are supported under the substantial evidence/reasonable juror standard."). To prevail, Glamourmom must demonstrate that substantial evidence does not support any of Appellees' inequitable conduct allegations.

B

Appellees' first inequitable conduct charge, that Glamourmom improperly withheld Leading Lady style 438 from the PTO, fails because no substantial evidence shows that style 438 was material to Ms. Rothman's application.

A piece of prior art is not material to patent prosecution when it is cumulative of information already before the examiner. 37 C.F.R. § 1.56(b) (2008) ("[I]nformation is material to patentability when it is not cumulative of information already of record or being made of record in the application"); Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1367 (Fed. Cir. 2008) ("It is well-established, however, that

information is not material if it is cumulative of other information already disclosed to the PTO."). An applicant has no duty to disclose a reference to the PTO if it is cumulative of or less material than references already before the examiner. Halliburton Co. v. Schlumberger Tech. Corp., 925 F.2d 1435, 1443 (Fed. Cir. 1991) ("[T]he cited references were more pertinent to the Halliburton applications than were the withheld references. Halliburton had no obligation to disclose cumulative references.").

The file history for the '029 patent is replete with nursing bra disclosures, including numerous nursing bras similar to style 438. For example, Mr. Jacobson cited U.S. Patent No. 4,633,876 to Scullin for a "Nursing Bra" and U.S. Patent No. 4,911,677 to White also for a "Nursing Bra" in an Information Disclosure Statement (IDS) received by the PTO on May 9, 2003. These nursing garments are similar in both style and coverage to Leading Lady style 438. Moreover, Appellees' expert, Mr. Burzynski, admitted that style 438 uses "cut fabric," or "a conventional outer fabric on [the] brassiere cup," as seen in the prior art, rather than the torso-covering fabric body of the claimed invention. As even cursory consideration of the record makes plain, Mr. Jacobson disclosed a variety of prior art garments employing such "a conventional outer fabric." For example, U.S. Patent No. 5,024,628 to Sanchez and U.S. Patent No. 5,094,647 to Courtney disclose the "conventional" cut fabric design common in the prior art without any additional fabric body to cover the wearer's torso.

Critically, Mr. Burzynski admitted that at least some of the prior art references cited by Mr. Jacobson during prosecution of the '029 patent were "just as relevant" as style 438:

> Q: Do you know whether or not any of the references that the examiner considered in allowing all the brassieres patents that the

examiner considered in allowing the '029 patent including the two-ply brassiere patents are just as relevant or more relevant than the JC Penney bra to this invention?

A:    Yes, they're just as relevant.

Indeed, at least two of these references were substantially more probative of patentability than style 438. The Clark and Vera patents, which Mr. Jacobson disclosed to the PTO by May 9, 2003 and July 28, 2003, respectively, incorporate the nursing bra features of style 438 and the disclosed prior art with a torso-covering garment as described in the '029 patent. These references read on the preferred embodiment of the claimed invention, rather than on the bra component of the invention alone, and are more material than style 438.

Thus, in light of the uncontested similarities between Leading Lady style 438 and the numerous garments Mr. Jacobson disclosed to the PTO, as well as Mr. Burzynski's testimony that those references were "just as relevant" to the patentability of the claimed invention as style 438, no reasonable jury could have found style 438 material. Therefore, no reasonable jury could have relied on that garment to support a finding of inequitable conduct.

C

Appellees also advance Glamourmom's failure to disclose Leading Lady style 460 to the PTO as an alternative basis for the jury's inequitable conduct verdict. Although style 460 is a nursing tank top similar to Ms. Rothman's invention, no substantial evidence shows that Glamourmom withheld that garment from the PTO with deceptive intent.

No reasonable jury could have found that Mr. Jacobson intended to deceive the PTO as to style 460 in light of Leading Lady's sharp business practices and Mr. Jacobson's submission of letters discussing style 460 to the PTO. Receipt of threatening letters containing vague descriptions of unsubstantiated prior art at the tail end of a souring business relationship does not create an automatic duty of disclosure. See Herbert, 99 F.3d at 1115-16. Otherwise, every potential patent licensee (and prospective infringer) could subject a patent applicant to the possibility of inequitable conduct sanctions on a whim. Leading Lady's conduct in this case illustrates the point.

Leading Lady had Glamourmom's sample product in its possession for a year before it ever informed Glamourmom of the existence of style 460. Indeed, even though style 460 is purportedly prior art to the '029 patent, Leading Lady nevertheless engaged Glamourmom in licensing negotiations for the rights to the '029 patent before it issued. Then, seemingly overnight, Leading Lady morphed from interested suitor offering favorable royalty terms and expressing assurance of "strong initial business" with a major retailer to a patent-eviscerating prior art holder. This course of conduct suggests, as Mr. Jacobson concluded, that Leading Lady acted in bad faith.

Based on Leading Lady's acknowledged conduct, no reasonable jury could attribute deceptive intent to Mr. Jacobson's decision not to disclose style 460 to the PTO. Indeed, as a threshold matter, there was nothing to disclose. Had Leading Lady supplied Glamourmom with more information than the simple declaration that Leading Lady had its own prior nursing tank top, Glamourmom might be charged with a duty to investigate further. However, in this case, Leading Lady simply informed Glamourmom—belatedly—of its proprietary design without sending a sample,

photograph, drawing, or description. Glamourmom cannot be charged with "culpable intent in withholding information that [it] did not have." Herbert, 99 F.3d at 1116 (internal quotation omitted). The heightened duty to "look for and produce all relevant prior art" associated with a Petition to Make Special, Gen. Electro Music Corp. v. Samick Music Corp., 19 F.3d 1405, 1411 (Fed. Cir. 1994), does not demand that the applicant somehow obtain proprietary information about unsubstantiated potential prior art that he believes in good faith is immaterial. Mr. Jacobson's letter to Mr. Corrado inviting further discussion regarding Leading Lady style 460 fully satisfied Glamourmom's investigatory and reporting duties.

Moreover, even crediting Leading Lady's revised chronology of its inventive endeavors on style 460, Mr. Jacobson had a good faith belief that style 460 was not material prior art. For starters, the provisional patent application for style 460 that Leading Lady sent to Mr. Jacobson lists the '029 patent as prior art and includes figures from Ms. Rothman's patent with the label "prior art." Even Leading Lady's amended inventive timeline buttresses the conclusion that style 460 came after Ms. Rothman's invention. Leading Lady only asserted in its letters that it had its own nursing tank top by August 2002. It did not offer a date of invention or allege that style 460 came into being before Ms. Rothman's design. Thus, Mr. Jacobson not only had a good faith basis for believing that style 460 was not prior art, but he had little basis on which to conclude that it was. See Herbert, 99 F.3d at 1116.

Mr. Jacobson's submission of Leading Lady's letters discussing styles 438 and 460 also belies the existence of any deceptive intent. Although he did not call the examiner's attention to these garments as prior art, he nevertheless disclosed them to

the PTO as part of his Petition to Make Special. Had Mr. Jacobson intended to conceal the existence of styles 438 and 460 from the PTO, he never would have included Leading Lady's letters in his petition filings.

Thus, the record contains no substantial evidence that Glamourmom intended to deceive the PTO in withholding Leading Lady style 460. Thus, no reasonable jury could base an inequitable conduct finding as to conduct regarding style 460 on this record.

D

The final grounds on which Appellees argue that the jury could have based its inequitable conduct verdict are purported misrepresentations of material fact contained in statements Mr. Jacobson made to the examiner during prosecution of the '029 patent. Because Mr. Jacobson's statements were legitimate attorney argument this court rejects that contention.

In response to an obviousness rejection by the examiner, Mr. Jacobson offered the following argument:

> Nursing garments are highly specialized garments that are designed produced and sold by a small segment of the clothing industry. Nursing garments, as distinguished from maternity garments, are not analogous prior art to women's garments in general. A nursing bra has a detachable nursing flap, structural feature not found in a regular bra. Therefore, it is improper to combine a prior art reference from nursing garments with a prior art reference from garments generally, with no connection to nursing garments.

Appellees challenge the propriety of these statements because Mr. Jacobson did not have any prior experience with nursing garments when he made them and because he did not consult anyone knowledgeable in the field before submitting them to the examiner.

The boundaries on a patent attorney's conduct are not so narrow, however. While the law prohibits genuine misrepresentations of material fact, a prosecuting attorney is free to present argument in favor of patentability without fear of committing inequitable conduct. See Young v. Lumenis, Inc., 492 F.3d 1336, 1348 (Fed. Cir. 2007) ("We therefore fail to see how the statements . . . which consist of attorney argument and an interpretation of what the prior art discloses, constitute affirmative misrepresentations of material fact."). This court has little basis to find deceptive intent in the routine back and forth between examiner and applicant. Moreover, this court recognizes that the Patent Act gives the examiner the discretion to reject or accept an applicant's arguments based on the examiner's own conclusions regarding the prosecution record. See id.

In this case, Mr. Jacobson's remarks show an effort to persuade that does not even approach an effort to deceive the PTO or abuse the prosecution process. The first half of his commentary builds toward the point that nursing garments differ from regular women's wear and maternity garments because nursing bras have "a detachable nursing flap, a structural feature not found in a regular bra." This conclusion is plainly accurate and in no way misstates any material facts.

Appellees find fault with the final sentence from the excerpt above. However, Mr. Jacobson's conclusion that it is "improper to combine a prior art reference from nursing garments with a prior art reference from garments generally, with no connection to nursing garments" is nothing more than attorney argument based on the foregoing facts. Mr. Jacobson's conclusion derives from his analysis that nursing garments are different from regular women's wear. The examiner was free to analyze that conclusion based

on the prior art and the nature of this predictable field. In any event, this type of conclusory analysis betrays no intent to deceive the PTO and obtain a patent with objectively false information. Rather, it is an attempt to characterize the prior art in a manner favorable to the attorney's client—far from deception. No reasonable jury could rely on Mr. Jacobson's statements as clear and convincing proof of inequitable conduct.

Because Appellees did not present substantial evidence supporting the materiality of Leading Lady style 438, substantial evidence that Glamourmom intended to deceive the PTO by withholding style 438 or style 460, or substantial evidence that Glamourmom affirmatively misrepresented material facts during prosecution of the '029 patent, this court reverses the jury verdict of inequitable conduct.

Because the district court based its award of costs to Defendants on the finding of inequitable conduct, see Rothman v. Target Corp., Civ. No. 05-4829, 2008 WL 4559698, at *3 (D.N.J. Oct. 8, 2008), this court vacates that award. Thus each party bears its own trial expenses.

AFFIRMED-IN-PART, REVERSED-IN-PART, VACATED, and REMANDED.

COSTS

Each party shall bear its own costs.