# United States Court of Appeals for the Federal Circuit

2007-1415, -1421

AGRIZAP, INC.,

Plaintiff-Cross Appellant,

v.

WOODSTREAM CORPORATION,

Defendant-Appellant.

Joel Mark, Nordman Cormany Hair & Compton LLP, of Oxnard, California, argued for plaintiff-cross appellant. With him on the brief was Brook J. Carroll.

Michael R. Slobasky, Jacobson Holman PLLC, of Washington, DC, argued for defendant-appellant. With him on the brief were Philip L. O'Neill and N. Whitney Wilson.

Appealed from: United States District Court for the Eastern District of Pennsylvania

Senior Judge Robert F. Kelly

# United States Court of Appeals for the Federal Circuit

2007-1415, -1421

AGRIZAP, INC.,

Plaintiff-Cross Appellant,

v.

WOODSTREAM CORPORATION,

Defendant-Appellant.

Appeals from the United States District Court for the Eastern District of Pennsylvania in case no. 04-CV-3925, Senior Judge Robert F. Kelly.

_____

DECIDED: March 28, 2008

_____

Before BRYSON and MOORE, <u>Circuit Judges</u>, and WOLLE, <u>Senior District Judge</u>.[1]

MOORE, <u>Circuit Judge</u>.

Agrizap, Inc. has sued Woodstream Corporation in the United States District Court for the Eastern District of Pennsylvania for fraudulent misrepresentation and infringement of U.S. Patent No. 5,949,636 (the '636 patent), which pertains to an electronic rodent-killing device. Woodstream appeals the district court's denial of its motion for judgment as a matter of law (JMOL) for no fraudulent misrepresentation. Woodstream also appeals the denial of its JMOL motion for invalidity and

---

[1]  Honorable Charles R. Wolle, Senior District Judge, United States District Court for the Southern District of Iowa, sitting by designation.

unenforceability.　Agrizap cross-appeals the district court's final judgment of noninfringement.

Because sufficient evidence supports the jury's verdict finding Woodstream liable for fraudulent misrepresentation and the trial evidence provides a reasonable basis for the jury's attendant award of damages, we affirm.　Though we defer to the jury for its fact findings on obviousness, we ultimately conclude that, despite those findings, the patent claims in dispute are invalid for obviousness and thus reverse the district court's denial of Woodstream's JMOL in that respect.　As our decision on those issues completely resolves this case, we decline to address the other arguments as to patent infringement, invalidity, or unenforceability.

## BACKGROUND

Agrizap is the holder of the '636 patent, which relates to a method and apparatus for electrocuting pests, such as gophers, rats, and the like.　The disclosed invention operates by sensing the presence of a pest with a resistive switch.　When the hapless pest makes contact with a high voltage electrode and a reference electrode, its body creates a leakage current that completes an electric circuit and triggers a generator. The generator then produces a voltage and current of sufficiently high magnitude to send the pest towards its demise.　After the expiration of a predetermined amount of time, the generator deactivates and cannot be retriggered to dispatch another pest until the invention is reset by turning it off and then on again.

In March of 2000, Woodstream, a nationwide distributor of pest control products such as traditional snap traps and glue traps, approached Agrizap about marketing the Rat Zapper, the commercial embodiment of the '636 patent.　The two parties engaged

in negotiations from April 2000 to September 2000.  During this time, they signed a mutual confidentiality agreement that permitted either party to disclose certain secret and proprietary information for the purposes of assessing Woodstream's interest in purchasing Agrizap's products and forming a business relationship with Agrizap.

In July 2000, without Agrizap's knowledge, Woodstream sent samples of the Rat Zapper to offshore Chinese manufacturers.  Upon learning of Woodstream's actions, in August 2000, Agrizap's president, Robert Noe, emailed Woodstream's executive vice president, Andy Woolworth, seeking written assurance that Woodstream's actions fell within the terms of their confidentiality agreement.  Woolworth responded but did not directly address the confidentiality agreement.  This prompted Noe to send a second email repeating his original request for assurances.  Only then did Woolworth respond, "Bob—Please reference our point 5 of the confidentiality agreement to cover your concern below.  We asked a source . . . to quote on the product."

Roughly five days later, unbeknownst to Agrizap, Woodstream instructed its Chinese supplier that it would make the product itself.  At trial, Woodstream admitted that its vice president had not actually read the confidentiality agreement.  An internal Woodstream document produced at that time revealed:  "We are going through Agrizap in the short term to give Woodstream access to the technology."

At the end of negotiations, the parties established an oral marketing agreement whereby Agrizap would fulfill Woodstream's purchase orders at a lower wholesale price. The products would still be named "Rat Zapper," but would use Woodstream's Victor brand label.  Woodstream agreed to distribute the Rat Zappers to large retail stores, such as Home Depot, Ace, and Lowe's.  Agrizap agreed not to compete with

Woodstream in these venues. Accordingly, from 2000-2003, Agrizap delivered 11,100 units of the Rat Zappers with the Victor label to Woodstream for a total of $226,000.

In 2003, Woodstream released its Electronic Mouse Trap (EMT) and in 2004, its Electronic Rat Trap (ERT). Upon learning of the ERT in 2004, Agrizap terminated its relationship with Woodstream. Agrizap claims that Woodstream purposely withheld information that it was using the Rat Zapper technology to develop its ERT. Further, Agrizap asserts that, had it known Woodstream's intentions to enter the market with a competing product, it would not have agreed to a distribution arrangement with Woodstream. Agrizap claims that, as a result of its reliance on Woodstream's statements, it suffered damages. But for Woodstream's misrepresentation, Agrizap would not have given Woodstream exclusive access to certain large retailers in the market, i.e., Home Depot and Ace Hardware, which allowed Woodstream to establish itself in those markets years earlier than it could have otherwise.[2]

Agrizap sued Woodstream, alleging that Woodstream fraudulently misrepresented its motive behind sending the Rat Zappers overseas. Agrizap contends that Woodstream suggested its actions were limited to cost evaluation so as to induce Agrizap to enter into a marketing and sales agreement with Woodstream. Agrizap also sued Woodstream for infringement of independent claim 1 and dependent claims 2, 3, 5, and 10, and independent claim 16 of the '636 patent (collectively, the asserted claims). Woodstream presented a vast arsenal of affirmative defenses of patent

---

[2] Agrizap also asserts that confusion in the retail market developed because of Woodstream's rat traps, which were allegedly of inferior quality. The ERT's packaging was similar to the Rat Zapper's, and Woodstream even kept the same Rat Zapper SKU number for the ERT. Ads selling the ERT used photos of the Rat Zapper. Noe testified that he had ordered a Rat Zapper from Ace's website a year after the ERT had been introduced on the market. He received an ERT instead.

invalidity (obviousness, incorrect inventorship, lack of written description/new matter, and lack of enablement) and unenforceability (for failure to disclose prior public use and for removing a named inventor).

The jury returned a verdict in favor of Agrizap on the fraudulent misrepresentation claim and awarded $1,275,000 in past and future damages. As for Agrizap's patent infringement claims, the jury found none of Woodstream's affirmative defenses viable. Determining that Woodstream had infringed independent claim 16, but not independent claim 1 or its dependent claims, the jury awarded $1,425,000 in damages.

Post-trial, Woodstream moved for JMOL as to the jury's verdict of fraudulent misrepresentation, infringement of claim 16 of the '636 patent, and failure to prove its affirmative defenses. Agrizap moved for JMOL of its own as to the jury's verdict of no infringement of claim 1 and its dependent claims. Overturning the jury's verdict that Woodstream had infringed claim 16 and denying Agrizap's JMOL motion, the district court thereby created a final judgment of noninfringement as to all the asserted claims of the '636 patent. The district court also denied the remainder of Woodstream's JMOL motion.

Woodstream now appeals the district court's denial of JMOL as to: (1) the fraudulent misrepresentation claim, (2) Woodstream's affirmative defense that the asserted claims of the '636 patent are invalid for obviousness and lack of written description/new matter, and (3) Woodstream's affirmative defense that the '636 patent is unenforceable on the basis that it was procured through inequitable conduct. Agrizap additionally cross-appeals: (1) the district court's grant of Woodstream's JMOL to hold

that claim 16 is not infringed and (2) the district court's denial of Agrizap's JMOL to hold that independent claim 1 and its dependent claims are not infringed. We first address the fraudulent misrepresentation claim and then turn to the patent law issues of this case.

## DISCUSSION

Because the denial or grant of a motion for JMOL is a procedural matter not unique to patent law, we abide by the standard of review of regional circuit law. Summit Tech., Inc. v. Nidek Co., 363 F.3d 1219, 1223 (Fed. Cir. 2004). Under Third Circuit law, we exercise plenary review over a district court's rulings on motions for JMOL, applying the same standard as the district court. Gagliardo v. Connaught Labs., Inc., 311 F.3d 565, 568 (3d Cir. 2002). Hence, a grant of JMOL is appropriate only where a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue. See Fed. R. Civ. P. 50(a). As the reviewing court, we are mindful that we "may not weigh the evidence, determine the credibility of witnesses, or substitute [our] version of the facts for the jury's version." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).

### I.

After thorough review of the evidence submitted to the jury, we conclude that Agrizap offered sufficient evidence to hold Woodstream liable for fraudulent misrepresentation and that the district court properly denied JMOL. Under Pennsylvania law, the elements of a fraudulent misrepresentation claim are: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with

knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994). Woodstream has failed to persuade us that anything less than sufficient evidence supports the jury verdict.

Regarding the appropriateness of the jury's award of $1,275,000, the question presented by the parties on appeal is a close and difficult one. As summarized in Delahanty v. First Pennsylvania Bank, N.A., under Pennsylvania law, "damages need not be proved with mathematical certainty, but only with reasonable certainty." 464 A.2d 1243, 1257-58 (Pa. 1983). That is, "[a]lthough the law does not command mathematical precision, sufficient facts must be introduced so that the court can arrive at an intelligent estimate without conjecture." Id. It is true that, as Woodstream contends, Agrizap never propounded a specific dollar amount for its fraud damages and instead left it up to the jury to extrapolate an amount from the various pieces of evidence submitted at trial. Nonetheless, Agrizap introduced sufficient facts for the jury to fairly estimate an amount of damages, including evidence based on the wholesale margin that Agrizap lost to Woodstream and Woodstream's launch plan expecting to achieve 50% market penetration within five years of an estimated market of $20 million per year. An award of damages is not precluded simply because of some uncertainty as to the precise amount of damages incurred. Id. at 1257. Woodstream, as the wrongdoer, bears the risk of that uncertainty. See id. In sum, we agree with the district court that Agrizap had offered substantial support for the jury award and that the jury's award is not unreasonable. See id. ("In reviewing the award of damages, the appellate

courts should give deference to the decisions of the trier of fact who is usually in a superior position to appraise and weigh the evidence.") (citations omitted). As for Woodstream's remaining arguments on the fraudulent misrepresentation claim, we have considered them and affirm the district court's judgment.

II.

Because the patent law aspects of this case can be decided entirely on the grounds of obviousness—notwithstanding the panoply of issues raised by the parties on appeal—we limit our discussion to only that which is necessary.

We review the underpinning facts of a jury verdict of nonobviousness for substantial evidence, according due deference to the jury, as always, in its role as the factfinder. See Structural Rubber Prods. Co. v. Park Rubber Co., 749 F.2d 707, 719 (Fed. Cir. 1984). Our review of the facts, regardless of whether they are explicit or implicit within the verdict, is bound by this high level of deference. See LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc., 275 F.3d 1347, 1353 (Fed. Cir. 2001). Thus, even when the jury is given an essentially black box verdict form—that is, a form that merely asks the jury to answer "yes" or "no" as to whether a claim is obvious, such as was done in this case[3]—we presume all factual disputes were resolved in favor of the verdict. See Jurgens v. McKasy, 927 F.2d 1552, 1557 (Fed. Cir. 1991).

---

[3] While a special verdict that asks a jury whether a patent claim is obvious provides more insight than one which simply asks whether the patent is invalid, the former still does not provide any detail into the specific fact findings made by the jury. Cf. Paul J. Zegger et. al, The Paper Side of Jury Patent Trials:  Jury Instructions, Special Verdict Forms, and Post-Trial Motions, 910 PLI/PAT 701, 716 (2007) ("By compelling a jury to consider factual issues individually, special verdicts and interrogatories may improve the consistency of jury verdicts as well as the underlying decision-making processes that produce them.").

2007-1415, -1421                                    8

However, as the ultimate conclusion of obviousness is a question of law, it remains our duty as the appellate court to ensure that the law has been correctly applied to the facts. Structural Rubber Prods., 749 F.2d at 719. In other words, we review de novo the conclusion on obviousness. Though we are fully cognizant of the hindsight bias that often plagues determinations of obviousness, Graham v. John Deere Co., 383 U.S. 1, 36 (1966), we are also mindful that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results," KSR Int'l Co. v. Teleflex Inc., 127 S. Ct. 1727, 1739 (2007).

During prosecution, the PTO rejected Agrizap's application for the '636 patent as being unpatentable over the claims of U.S. Patent No. 5,269,091 (the '091 patent) in view of U.S. Patent No. 4,048,746 (the Dye patent), and U.S. Patent No. 4,200,809 (the Madsen patent) due to obviousness-type double patenting. The '091 patent, a patent that Agrizap obtained before the '636 patent, is also directed to a pest electrocution device and discloses all of the limitations of the asserted claims in the '636 patent with one exception—it discloses a mechanical switch instead of a resistive switch to complete its circuit. At two separate trade shows in California in February of 1993, Agrizap demonstrated a commercial embodiment of the '091 patent, the Gopher Zapper. It is undisputed that, while the PTO was aware of the '091 patent, it was not aware of the public use of its commercial embodiment.

The Dye patent, which Agrizap's expert described as a "killer cane," discloses "[a]n electronic executing device used to demise gophers and other underground rodents" wherein the presence of the rodent completes the circuit when it touches two separate contact points. While the Madsen patent does not pertain to pest control, it

discloses an apparatus akin to a cattle prod that generates an electric charge when an external load, such as the body of a cow, completes a circuit by crossing two electrodes and creating a resistance current. Notably, in its rejection, the PTO explained that "[t]he patented claims differ [from the claims of the '091 patent] in the type of sensor used to effect the electrocution. . . . Thus the obvious substitution is that of the above combination of DYE and MADSEN as set forth above in detail regarding the use of electrocution via the resistive sensing electrodes." In response, Agrizap corrected the inventorship for the '636 patent so that both the '636 patent and the '091 patent had the same inventor and filed for terminal disclaimer. This eliminated the '091 patent as a basis for rejection for obviousness-type double patenting.

Woodstream contends on appeal that the claims of the '636 patent are obvious and thus invalid in light of the Gopher Zapper, the Dye patent, and the Madsen patent. In support, Woodstream argues that the examiner properly rejected the asserted claims during prosecution based on the '091 patent, the Dye patent, and the Madsen patent—a combination of prior art identical to that which has been presented by Woodstream on appeal. While Agrizap's correction of inventorship disqualified the '091 patent as a basis for a double patenting rejection, it did not disqualify the commercial embodiment of that patent, the Gopher Zapper, from being considered as prior art. The parties do not dispute that the Gopher Zapper was used in public more than a year before the filing date of the '636 patent and is therefore prior art. Moreover, there is no dispute that the '091 patent and, in turn, the Gopher Zapper disclose every single limitation of the asserted claims save for the resistive switch that is disclosed in the Madsen and Dye patents. See Oral Arg. Tr. 33:56-36:42 (Feb. 7, 2008). Thus, we effectively find

ourselves in the curious position of reviewing the same prior art that the PTO relied upon to reject the asserted claims.

Certainly, the PTO's rejection in light of this identical prior art is by no means dispositive of the issues that need to be resolved to determine the validity of the asserted claims. The PTO was never presented with the objective evidence of nonobviousness, including the commercial success of the Rat Zapper, copying by Woodstream, and a long felt need in the market for electronic rat traps, which was presented to the jury. Even when we presume the jury found that the objective evidence of nonobviousness favored Agrizap, this evidence is insufficient to overcome the overwhelming strength of Woodstream's prima facie case of obviousness.

This is a textbook case of when the asserted claims involve a combination of familiar elements according to known methods that does no more than yield predictable results. KSR, 127 S. Ct. at 1739. The only difference between the Gopher Zapper and the asserted claims, as conceded by Agrizap, is the type of switch used to complete the circuit that triggers the generator. The asserted claims simply substitute a resistive electrical switch for the mechanical pressure switch employed by the Gopher Zapper. As illustrated by the Dye and Madsen patents, the use of an animal body as a resistive switch to complete a circuit for the generation of an electric charge was already well known in the prior art. In favoring resistive switches over mechanical switches, both the Dye and Madsen patents are directed to solving the same problem as the '636 patent— the malfunction of mechanical switches in environments prone to dirt and dampness. See '746 patent col.1 ll.43-46, ll.53-63; '809 patent col.1 ll.31-55.

In this case, the objective evidence of nonobviousness simply cannot overcome such a strong prima facie case of obviousness. Similarly, in <u>Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.</u> we held that the objective considerations of nonobviousness presented in that case, including substantial evidence of commercial success, praise, and long-felt need, were inadequate to overcome a strong showing of primary considerations that rendered the claims at issue invalid. 485 F.3d 1157, 1162 (Fed. Cir. 2007). Based on the foregoing, we reverse the district court's denial of Woodstream's motion for JMOL as to the obviousness of the asserted claims.

## CONCLUSION

Because we hold that the asserted claims are invalid, we have no need to reach, and thus decline to address, Woodstream's other affirmative defenses regarding patent invalidity and unenforceability and Agrizap's arguments regarding infringement. For the above reasons, we affirm the district court's entry of judgment of fraudulent misrepresentation against Woodstream and reverse the district court's denial of JMOL of invalidity as to the asserted claims against Agrizap.

<u>AFFIRMED-IN-PART</u> and <u>REVERSED-IN-PART</u>.